**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

LAWMAN ARMOR CORPORATION,    )
                                 )
           **Plaintiff,**          )
                                 )      **Civ. Action No. 02-CV-4595**
        **v.**                 )
                                 )      **Hon. Robert F. Kelly**
WINNER INTERNATIONAL LLC,      )
                                 )
          **Defendant.**        )

## PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR LEAVE TO AMEND

Pursuant to the Court's Order of October 22, 2003, Lawman Armor Corporation ("Lawman" or "Plaintiff") submits this short Reply in support of its Motion to Amend.

Defendant has not presented any evidence or law that would preclude this Court from granting Lawman's request to amend. Indeed, recent testimony by James E. Winner, Jr. and Karen Winner Hale has confirmed that:

- Winner Holding LLC actively administered and operated Winner during at least the first years of Winner's infringement of the '621 Patent;

- Mr. Winner and Ms. Winner Hale are individually liable as actors, not as owners, for patent infringement. There is no need to "pierce the corporate veil" to hold them personally liable; and

- Venue for all three is proper in the Eastern District of Pennsylvania.

Based on these facts and under the governing law, Lawman is entitled to amend its Complaint in this case to add Winner Holding LLC, Mr. Winner, and Ms. Winner Hale as defendants to Lawman's claims for patent infringement.

## I. Discovery Revealed That From 1998 To At Least 2000, Winner Holding LLC Played An Active Role Administering And Controlling Defendant.

Defendant's only response to the motion to amend is to claim that Winner Holding ceased its oversight of Defendant three years ago, and that Winner Holding never directly made

or sold the infringing products.  Those arguments do not defeat the motion.

A parent holding company can be held be liable for patent infringement under several theories—regardless of whether that company ever directly made or sold product.  Frank Manchak, Jr., v. Rollins Environmental Services, Inc., No. 96-37 (SLR), 1996 WL 790100 at *3 (D. Del. Dec. 18, 1996) (holding companies can be liable for infringement under agency, alter ego or piercing the corporate veil theories).   In addition, recovery of damages for patent infringement applies to any infringement during the six year period prior to filing of the suit.  35 U.S.C. § 286.

In its Opposition, Defendant concedes that from 1998 (when it began selling the products at issue) to at least 2000, Winner Holding LLC actively oversaw and maintained the administration and operation of its subsidiary, Defendant.  (Opp. at 3.)  The testimony of Ms. Winner Hale confirms that Winner Holding LLC "would oversee selective various Winner companies and that would allow those companies to share in administrative services."  (Field Decl., Ex. B at 39.)  That oversight was comprehensive, and it involved Mr. Winner as the person in charge of management overview of the various companies.  It also included financial oversight, development oversight, and legal oversight.  (Id. at 41-42.)

The testimony of Mr. Winner further confirms the involvement of Winner Holding in the infringement.  He testified that while he was CEO of Winner Holding LLC, and simultaneously Chairman of Defendant in the late 1990s, he traveled to Asia to identify the products that, beginning in 1998, became Winner's infringing "Double Hook" and other products.  He also spearheaded the development of those products.  (Field Decl., Ex. A at 11, 21, 23.)

Discovery has also revealed that the Winner companies have been in financial difficulty, necessitating drastic cutbacks in staffing levels.  (Field Decl., Ex. B at 56.)  The corporate

- 2 -

restructuring detailed in Winner's Opposition and in the testimony of Mr. Winner and Ms. Winner Hale is a result of the financial difficulties that left Winner "very near bankruptcy." (Field Decl., Ex. A at 7; Ex. B at 40-45, 56.)  Lawman is concerned that this corporate restructuring may unfairly shield Defendant from liability, and prevent Lawman from enforcing any financial judgment rendered by this Court.  It is therefore essential that Winner Holding LLC be added as a defendant in this action to ensure that Defendant cannot avoid liability and damages merely by changing its corporate structure.

## II. James E. Winner, Jr. And Karen Winner Hale Are Personally Liable As Actors, Not Owners.  It Is Therefore Not Necessary To "Pierce The Corporate Veil" To Find Liability.

A corporate officer is individually liable for the torts he or she personally commits and cannot use a corporation as a shield when he or she is an actual participant in the tort. Donsco, Inc. v. Casper Corp., 587 F.2d 602, 606 (3d Cir. 1978).  The fact that an officer is acting for a corporation also may make the corporation vicariously or secondarily liable under the doctrine of respondeat superior.  Id.  But it does not relieve the individual of individual responsibility.  Id. Acts including authorizing and approving the infringement, and arranging for the infringing materials to be provided are "sufficient actual participation in the wrongful acts" to create personal liability.  Id.  Such liability is "distinct from the liability resulting from the piercing of the corporate veil."  Id.  The effect of piercing a corporate veil is to hold the owner liable.  Id. Under Donsco, liability is created as an actor rather than as an owner.  Id.  Under Donsco, liability does not depend on piercing the corporate veil.

The Federal Circuit Court of Appeals applies this same rule.  For a corporate officer to be personally liable for inducing infringement, it is not necessary that the corporate veil be pierced.

Hoover Group, Inc., v. Custom Metalcraft, Inc., 84 F.3d 1408 (Fed. Cir. 1996) (internal citations omitted).

Here, Mr. Winner, in his capacity as both Chairman and CEO of Defendant and of Winner Holding, traveled to Asia on a buying and research trip in 1996. (Field Decl., Ex. A at 9-14.) Mr. Winner saw twin hooks type steering wheel locks manufactured by Keen and incorporating the design of the '621 Patent. (Id. at 20-23.) Mr. Winner knew that the twin hooks devices were covered by the '621 Patent which was owned by Keen Tools Corp. at that time, and were on sale in the United States. (Id. at 23-25.) Mr. Winner arranged for samples to either be sent to headquarters, or arranged to have the samples delivered. (Id. at 11-12.) He participated in making minor changes to the design. (Id. at 14.) He was aware of patent infringement lawsuits against Winner brought by Keen Tools in Florida. (Id. at 30.) Mr. Winner clearly played an active role, if not the main role, in the decision to copy the '621 Patent and in the subsequent manufacturing and selling of the accused devices.

Ms. Winner Hale, simultaneously COO of Defendant and an officer of Winner Holding, knew that the double hook products that Defendant was contemplating manufacturing were already in existence and already offered for sale by Keen Tools, Lawman's predecessor in interest in the '621 Patent. (Field Decl., Ex. B at 96-97.) Ms. Hale participated in sales and marketing meetings concerning the accused devices and approved purchase orders for those devices. (Id. at 31-32.)

Mr. Winner and Ms. Winner Hale have personal liability as actors in Defendant's infringement of the '621 Patent, not merely as owners. Their liability is therefore not dependent on piercing the corporate veil.

**III. Venue For Personal Liability Of A Corporate Officer Or Owner May Be Based On Venue For The Corporation.  Here, Venue For All of the Proposed Defendants Lies In The Eastern District Of Pennsylvania.**

Venue as to all of the three proposed defendants is proper in this district.

Because of the active role of Winner Holding LLC and its officers and directors in overseeing and administering Defendant in the period of infringement, venue for Winner Holding LLC as a corporate defendant is the same as for Defendant—in the Eastern District of Pennsylvania.  28 U.S.C. § 1391(c).

Venue for the individual proposed defendants also properly lies in this district.  The Federal Circuit Court of Appeals has held that venue for personal liability of a corporate officer/owner for acts of patent infringement by the corporation may reasonably be based on corporate venue provisions.  Hoover Group, Inc., v. Custom Metalcraft, Inc., 84 F.3d 1408, 1410 (Fed. Cir. 1996).

This Court has characterized the issue as one of "pendent venue."  John J. Lommano v. Thomas Black, et al., Civ. A. No. 02-8669, 2003 WL 22228512 at *10, n. 7 (E.D. Pa. Sept. 29, 2003) (internal citations omitted).  That is, where claims against individuals and their corporate entity are the same and arise from a "common nucleus of operative facts," venue as to the claims against the individuals tracks venue for the corporation.  Id.  This Court further stated that the principle "is generally applied when the causes of action have identical parties and proofs."  Id.

The "pendent venue" test of Lommano v. Black applies here:

1) The claims in this case against all four defendants "arise out of a common nucleus of operative facts:" the infringing activities of Winner International LLC, the control over Winner exercised by Winner Holding LLC, and the individual liability arising from the acts of James E. Winner Jr. and Karen Winner Hale.

- 5 -

2) The causes of action have identical parties and proofs: patent infringement is the claim against all defendants.

3) The claims against the multiple defendants do not differ: each defendant has liability for infringement of the '621 Patent.

Under the Federal Circuit rule stated in <u>Hoover v. Custom Metalcraft</u>, and under the tests for pendant venue stated by this Court, James E. Winner Jr. and Karen Winner Hale are both subject to the same venue that applies to Winner International LLC—the Eastern District of Pennsylvania.

## CONCLUSION

Lawman's Motion to Amend must be granted because

- Winner Holding LLC actively administered and operated Winner during at least the first years of Winner's infringement of the '621 Patent;

- James E. Winner Jr. and Karen Winner Hale are individually liable as actors, not as owners, for patent infringement. There is no need to "pierce the corporate veil" to hold them personally liable; and

- Venue for all three is proper in the Eastern District of Pennsylvania.

*Corey Field*

Roberta Jacobs-Meadway
Lynn E. Rzonca
Corey Field
BALLARD SPAHR ANDREWS & INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 665-8500
Attorneys for Plaintiff Lawman Armor Corp.

Date: November 3, 2003

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LAWMAN ARMOR CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Civ. Action No. 02-CV-4595 |
| | ) | |
| v. | ) | Hon. Robert F. Kelly |
| | ) | |
| WINNER INTERNATIONAL, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF COREY FIELD IN SUPPORT OF LAWMAN ARMOR CORP.'S
REPLY BRIEF FOR MOTION FOR LEAVE TO AMEND**

I, Corey Field, hereby declare under penalty of perjury that the following is true and correct:

1.    I am an adult resident of the Commonwealth of Pennsylvania and an associate with the law firm of Ballard Spahr Andrews & Ingersoll, LLP. This declaration is submitted in support of Lawman Armor Corporation's Reply Brief for Lawman's Motion for Leave to Amend.

2.    Attached hereto as Exhibit A is a true and correct copy of pages from the deposition transcript of James E. Winner Jr. (pages 7, 9-14, 20-25, 30).

3.    Attached hereto as Exhibit B is a true and correct copy of pages from the deposition transcript of Karen Winner Hale (pages 31-32, 39, 40-45, 53, 56, 96-97).

Date: November 3, 2003

_____
Corey Field

- 1 -

# EXHIBIT A

Winner

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LAWMAN ARMOR CORPORATION ) CIVIL DIVISION
                                                 )
                                                 ) Case No. 2:02-CV-04595-RK
      Plaintiffs,    )
                              ) DATE:
   vs.              ) October 23, 2003
                              )
WINNER INTERNATIONAL,   ) REPORTED BY:
LLC,              ) Colleen A. Kennelly
                    )
     Defendants.    )

DEPOSITION OF JAMES E. WINNER, JR.,

a witness herein, called upon for examination,

take pursuant to the Federal Rules of Civil

Procedure, by and before Colleen A. Kennelly, a

Court Reporter and Notary Public in and for the

Commonwealth of Pennsylvania, at the Radisson

Hotel, Board Room II, Middlesex, Pennsylvania

on Thursday, October 23, 2003, commencing at

10:05 a.m.

GOLDEN TRIANGLE REPORTERS, INC.
Pittsburgh Office
(412) 261-4565

Winner

7

1    note, and I believe that note is from Winner

2    Steel.

3  Q  Are you familiar with a company called Winner

4    National Royalty, LLC?

5  A  I am.

6  Q  What is that?

7  A  It's a company in Delaware, and that holds our

8    international -- or what do you call it --

9    intellectual property rights.

10  Q  Does Winner International Royalty, LLC hold all

11    the intellectual rights of Winner International,

12    Inc.?

13  A  I believe that to be true.

14  Q  What position do you hold with Winner

15    International, Inc.?

16  A  Today as chairman and CEO.

17  Q  How long have you been the chief executive

18    officer of Winner International?

19  A  I believe I came back as CEO in 2000 -- I believe

20    2001, mid year, I believe, 2001.

21  Q  What happened mid year in 2001 to cause you to

22    come back as chief executive officer?

23  A  The company was very near bankruptcy.

GOLDEN TRIANGLE REPORTERS, INC.
Pittsburgh Office
(412) 261-4565

Winner

9

1   A  Chairman.

2   Q  -- with the company?

3   A  It might have been '94, it was right in that

4      range in the mid '90s.

5   Q  In the period from approximately 1994 until the

6      middle of 2001, what were your responsibilities

7      in connection with the business of Winner

8      International?

9   A  I had overview responsibilities.  I did not have

10     day-to-day operational responsibilities.

11  Q  In the period when you were chairman and chief

12     executive officer before the middle of 2001, did

13     you play any role in product design?

14  A  I would have been typically consulted on product

15     design, yes.

16  Q  Did you have any role during that period in

17     determining what products Winner would offer?

18  A  It's hard to answer because the answer is yes and

19     no.  Anything with wheel locks I would have had

20     responsibility for helping make those decisions.

21     In the padlock lines, I didn't really care, I

22     just wanted them to have a full expansion of pad

23     locks.

GOLDEN TRIANGLE REPORTERS, INC.
Pittsburgh Office
(412) 261-4565

Winner

10

1  Q  During the period of time when you were the

2     chairman and not chief executive officer, again,

3     did you have any responsibility for the

4     purchasing of the wheel lock products or any role

5     in purchasing product?

6  A  Physically purchasing, no; making some decisions

7     towards purchasing, possibly.

8  Q  On what types of occasions would you be involved

9     in decisions about purchasing of the steering

10     wheel lock products?

11  A  It mostly would be if I would see something that

12     I thought it would be a marketable product in the

13     United States.  If I would see it in Asia when I

14     was traveling, or if I would see it in a catalog,

15     I'd bring it back and we'd talk about it

16     internally about potentially representing it.

17  Q  I'm going to direct your attention to a product

18     which bears the designation Twin Hooks and the

19     Winner SKU is 0006, Production No. W4, and ask if

20     you're familiar with that product?

21  A  I am.

22  Q  When did Winner first offer that product for

23     sale, the Twin Hooks product?

GOLDEN TRIANGLE REPORTERS, INC.
Pittsburgh Office
(412) 261-4565

Winner

11

1   A  I'm really not certain.  I know the first time I

2      saw a like product, but I can't even tell you

3      precisely when that was, but I saw it in Asia.

4   Q  Can you tell me approximately when?

5   A  I would think it had to have been sometime mid

6      '90s.

7   Q  Would 1996 ring a bell?

8   A  It could work.

9   Q  And do you remember who was making the product

10     that you saw in Asia in approximately 1996?

11  A  I don't remember.

12  Q  Did you bring the product back to the United

13     States at that time?

14  A  I don't remember that either.

15  Q  After you saw the product in Asia, did you have

16     any discussions about the product or bringing the

17     product back to the United States?

18  A  I did.

19  Q  With whom did you have those discussions?

20  A  I talked to my son, my son Kevin, who was the

21     primary contact at that time and liaison with the

22     factories, and I remember that conversation.  I

23     suspect I would have talked to Karen and maybe

Winner

12

☐

1    some of the other people in the company.

2  Q  By Karen, that's Karen Winner Hale?

3  A  Correct.

4  Q  And what was her position with the company at

5    that time?

6  A  COO.

7  Q  Do you remember the nature of those

8    conversations?

9  A  No.  It was just -- I remember more distinctly

10    with Kevin because I remember it was something we

11    should look at and consider; and he should

12    investigate it as to, you know, sourcing the

13    product.

14  Q  Do you know whether Kevin Winner did investigate

15    sourcing the product?

16  A  I believe he did.

17  Q  Did Kevin Winner report back to you with the

18    results of his investigation?

19  A  I don't remember the detail, but I know

20    subsequently we did bring the product in, so

21    apparently he did.

22  Q  Was there any other investigation that you recall

23    with respect to the product, which is represented

Winner

□                                    13

1    by the Twin Hooks product on the table, other

2    than finding a factory to bring the product in?

3  A  Not that I remember.

4  Q  During the period of time when you were the

5    chairman of the board and not, again, the chief

6    executive officer, did you have any role in

7    connection with marketing or sales for the

8    company?

9  A  I would sit occasionally in meetings when they

10    met.

11  Q  During that same period of time, did you have any

12    role or responsibility in connection with

13    research and development?

14  A  If any, it just would have been advisory.  And if

15    somebody had an idea they might have brought it

16    to me.

17  Q  At that point in time, did Winner have a market

18    research department?

19  A  We had one for awhile, but I can't remember what

20    period of time it was.

21  Q  Do you recall any market research being done in

22    connection with the product exemplified by the

23    Twin Hooks product?

Winner

14

1  A  The only thing I remember being done with the

2     Twin Hook product was at some given point, I

3     don't know when it was, it was expanding the

4     widths of the hooks to make them wider so they

5     would fit more steering wheels.

6  Q  Were you involved in the discussion of expanding

7     the width of the hooks?

8  A  Yes, I was.

9  Q  And what was the nature of your involvement, sir?

10  A  I believe, if my memory serves me, I think it was

11     somebody named -- a nephew, Kevin Wellendorf,

12     that worked for us.  And I forget who else was

13     involved.  Either I had asked, or myself and

14     somebody else had asked that they go out and

15     physically look at a lot of steering wheels in

16     car dealerships to determine if a wider spread

17     would fit more wheels, if that was a problem.

18  Q  Was there a problem with the original Twin Hooks

19     product not fitting enough steering wheels?

20  A  I believe that to be correct.

21  Q  Now, subsequent to the time you became chief

22     executive officer again in mid 2001, did your

23     day-to-day responsibilities change?

GOLDEN TRIANGLE REPORTERS, INC.
Pittsburgh Office
(412) 261-4565

Winner

20

□

1   an auto supply division of big blocks, Kmart or

2   Wal-Mart or somebody.

3   Q  Are there any modifications that Winner is

4   contemplating for the Twin Hooks or the Double

5   Hooks?

6   A  I'm not aware.

7   Q  Were any design changes made to the Twin Hooks or

8   Double Hooks product from the product that you

9   originally saw in Asia?

10  A  I think the primary one -- it might have been the

11  lock housing, because the lock housing on The

12  Club itself, on the unit itself and the width of

13  the hooks.

14  Q  Now, I believe you testified that that change was

15  made so that the device would fit more steering

16  wheels?

17  A  That's correct.

18  Q  And that change was made after the Twin Hooks and

19  the Double Hooks units had been offered for sale

20  by Winner in the United States?

21  A  I'm not certain of that.

22  Q  Before Winner brought the Twin Hooks and Double

23  Hooks product into the United States, was there

GOLDEN TRIANGLE REPORTERS, INC.
Pittsburgh Office
(412) 261-4565

Winner

21

☐

1    any testing of the product done to your

2    knowledge?

3    A  Any what?

4    Q  Testing.

5    A  I suspect there was, that would be -- my son

6      would have done it or he would have had it done.

7    Q  By your son, you mean Kevin?

8    A  Kevin, yes.

9    Q  Do you remember Kevin Winner reporting to you any

10     issues resulting from testing that he did?

11   A  I don't remember.

12   Q  When you first saw the product exemplified by the

13     Twin Hook or Double Hook product in Asia, were

14     you with anyone else from Winner --

15   A  I'm sorry --

16   Q  -- when you were in Asia?

17   A  Yes.

18   Q  And you first saw the product of the type

19     represented by the Double Hooks and Twin Hooks

20     products?

21   A  Yes.

22   Q  Was there anyone from the company with you?

23   A  No.

Winner

☐

1  Q  What was the occasion of your trip to Asia at

2      that time?

3  A  We manufactured -- we were manufacturing not just

4      Clubs, we were manufacturing other products in

5      Asia.

6  Q  Were you meeting with trading companies or

7      factories or both or --

8  A  Both.

9  Q  Do you recall who you were with when you first

10     saw the product exemplified by the Twin Hooks and

11     Double Hooks product?

12 A  I do not.

13 Q  Do you remember if you were at a factory or at a

14     trading company?

15 A  I do not.

16 Q  Was there any other product during that trip

17     besides the Twin Hook or Double Hook product that

18     you thought would be worth adding to the Winner

19     line?

20 A  I don't remember.

21 Q  Did you bring back one of the Twin Hook or Double

22     Hook products with you at that time?

23 A  I don't remember if I brought any of them back or

Winner

23

☐

1    not.

2    Q  Do you remember if you had one shipped back to

3        Sharon, Pennsylvania?

4    A  I don't remember.

5    Q  At the time you saw the Twin Hooks or Double

6        Hooks product in Asia, do you know if there were

7        any other companies in the United States or any

8        other company selling into the United States a

9        product having that general appearance?

10   A  I don't know.  You know, I know there was one --

11       I don't know if it was pre- or after the company,

12       called Keen.  Keen was selling one, but I just

13       don't remember when it was.

14   Q  Did you ever see the Keen product on sale in the

15       United States?

16   A  Yes, I did.

17   Q  Do you remember where?

18   A  I believe it to be AutoZone.

19   Q  And was the Keen product that you saw on the

20       shelves in AutoZone?

21   A  Correct.

22   Q  Do you recall seeing the Keen product anyplace

23       else?

Winner

24

□

1    A  That's where I remember.

2    Q  Was there ever an occasion when you did any

3        investigation to determine whether there was a

4        patent on the Keen product?

5    A  Yes, there was.

6    Q  And when was that investigation undertaken?

7    A  I don't remember.  I can't tell you the time or

8        the year.  What I remember was we asked our

9        patent attorney to look at our product and then

10       ascertain -- and that it did not violate any

11       patents.

12   Q  And at that time did your patent attorney

13       identify for you a Keen patent?

14   A  He identified the only patent that existed on the

15       Double Hook that he apparently found.

16   Q  I show you a copy of Design Patent 357621 and ask

17       if that's the patent to which you just referred?

18   A  That's correct.

19   Q  Who was the patent attorney that you spoke to

20       about the Double Hook or Twin Hook product?

21   A  Bob Vickers.

22   Q  And when did you have this conversation first

23       with Mr. Vickers?

GOLDEN TRIANGLE REPORTERS, INC.
Pittsburgh Office
(412) 261-4565

Winner

25

☐

1   A  I don't remember that.

2   Q  Was it before or after Winner began importing the

3      Twin Hooks and Double Hooks product?

4   A  It was before we sold them.  I'm not certain if

5      we had -- if we brought any in or not by that

6      time.

7   Q  At the time Winner began bringing in the Twin

8      Hooks and Double Hooks product, were you aware

9      that the Keen product was available at AutoZone?

10  A  Yes, we were.

11  Q  Did you --

12  A  Excuse me, let me back up.  We might have brought

13     them in before I was aware of it -- it was about

14     the same time.  I'm not exactly sure precisely

15     what time.

16  Q  Have you subsequently seen any other products

17     that are steering wheel locks with twin or double

18     hooks?

19  A  Yes, we've seen them now from Master Lock.

20  Q  When did you first see a Master Lock product with

21     the Twin Hook configuration?

22  A  I believe within the last couple of years.

23  Q  Where have you seen the Master Lock product?

# EXHIBIT B

-----

UNITED STATES DISTRICT COURT
OF THE EASTERN DISTRICT OF PENNSYLVANIA

-----

LAWMAN ARMOR COMPANY,        ) CIVIL DIVISION
                             )
           Plaintiff,        ) No. 2:02-CV-04595-RK
                             )
           vs.               ) DEPOSITION OF:
                             )  Karen Winner Hale
                             )
WINNER INTERNATIONAL, LLC    )
                             ) DATE:
           Defendant.        )  October 22, 2003
                             )
                             )
                             ) REPORTED BY:
                             )  Michelle L. Deliman

-----

DEPOSITION OF KAREN WINNER HALE, a witness
herein, called upon for examination, taken pursuant
to the Pennsylvania Rules of Civil Procedure, by and
before Michelle L. Deliman, a Court Reporter and
Notary Public in and for the Commonwealth of
Pennsylvania, at the Radisson Hotel, Board Room II,
Middlesex, Pennsylvania, on Wednesday,
October 22, 2003, commencing at 9:00 a.m.



OCT 31 2003

COPY

29

-----

1     you were the chief executive officer of the
2     company?
3   A  No.
4   Q  When did Winner go into the battery business?
5   A  We are just now going into the battery business.
6   Q  In connection with the Quad Lock Hook and the
7     Dr. Hook products, what did you do in connection
8     with those product introductions?
9   A  Well, I had met with the representative from
10    American Auto Accessories at a trade show, as
11    far as that product and the Dr. Hook.  Plus, I
12    had talked with his attorney about settlement.
13    I had -- I was involved in the legal department
14    with the settlement of the American Auto
15    Accessories.
16  Q  Who did you meet with from American Auto
17    Accessories?
18  A  Henry Sue.
19  Q  Did you meet with anyone from American Auto
20    Accessories?
21  A  I believe his attorney, Steven Gafagin, was at
22    the same show.
23  Q  What show was this?

GOLDEN TRIANGLE REPORTERS
One Gateway Center - Suite 653
(412) 261-4565

30

-----

1   A  That would have been the automotive show in
2     Las Vegas.  We now call it AAPEX.
3   Q  What year was this show?
4   A  2000.
5   Q  What settlement was this with reference to?
6   A  They had a line of products called the Dr. Hook
7     and the Dr. Hook Plus that was using a
8     self-locking mechanism.
9   Q  What was the issue with the self-locking
10    mechanism?
11  A  It was infringing on our patent.
12  Q  Was there litigation with American Auto
13    Accessories?
14  A  There was.
15  Q  Where was that litigation?
16  A  I believe it was in New York.
17  Q  Was that litigation resolved?
18  A  The case was settled.
19  Q  Does American Auto Accessories still sell a
20    Dr. Hook or Dr. Hook Plus product?
21  A  Not that I know of.
22  Q  Was there any discussion with Mr. Sue or anyone
23    else representing American Auto Accessories

GOLDEN TRIANGLE REPORTERS
One Gateway Center - Suite 653
(412) 261-4565

31

-----

1     concerning anything other than the self-locking
2     mechanism?
3   A  You mean outside of settlement?
4   Q  Outside of any issue involving the self-locking
5     mechanism.
6   A  No.
7   Q  Does Winner International use a self-locking
8     mechanism on any product?
9   A  Yes.
10  Q  On what products?
11  A  On most of our products.  I should clarify to
12    say on most of our steering wheel locks, not the
13    hardware.
14  Q  Other than working in connection with the
15    settlement of the American Auto Accessories
16    litigation, did you have any other role or take
17    any other part in connection with the
18    development of the Quad Lock Hooks?
19  A  I know I was in informal sales meetings and
20    marketing meetings where we talked about what
21    color it should be and what the package should
22    look like, but I would only be there for
23    discussion purposes.

GOLDEN TRIANGLE REPORTERS
One Gateway Center - Suite 653
(412) 261-4565

32

-----

1   Q  You would sign off on the purchase orders?
2   A  I would.
3   Q  Who developed the Quad Lock --
4       Who developed the Quad Lock Hook product for
5     Winner International?
6   A  I believe it was an existing patent that we
7     acquired during the settlement with American
8     Auto Accessories.
9   Q  Did Winner take an assignment of an American
10    Auto Accessories patent?
11  A  I don't know if assignment is the right legal
12    term.  I just know as part of the settlement we
13    did receive that patent.
14  Q  What was the patent on?
15  A  It was their Dr. Hook Plus product.
16  Q  Was it a design patent or utility patent?
17  A  Utility patent, I believe.
18  Q  Do you know how long American Auto Accessories
19    had sold the Dr. Hook product?
20  A  I don't.
21  Q  Did Winner International also acquire the
22    Dr. Hook trademark?
23  A  Yes.

GOLDEN TRIANGLE REPORTERS
One Gateway Center - Suite 653
(412) 261-4565

37

-----

1    Winner International PA Business Trust on the
2    document.
3        Do you see that?
4  A  Yes, I do.
5  Q  What do these different dates signify, 2/29/1996
6    5/17/96, 4/14/97?
7  A  Can you show me where you are at?
8  Q  (Indicating)
9  A  Are you asking why there are different entries?
10 Q  Yes.
11 A  Looking at it, I would say it is because the
12    officers changed at that time period.  The
13    business trust still existed, but underneath it
14    the trustees changed.
15 Q  Although I note there is specific entries for
16    trustees changing under each of these different
17    heading.  By way of example, looking at the
18    entry for April 15, 1997, there are separate
19    entries for Mr. Quinn and Mr. McCracken.
20        MR. MOY:  Counsel, I think you
21        said those are trustees changing.  I
22        believe the trustees are marked with
23        an asterisk and there are no asterisks

GOLDEN TRIANGLE REPORTERS
One Gateway Center - Suite 653
(412) 261-4565

38

-----

1        after those individuals.
2  BY MS. MEADWAY:
3  Q  Are you saying that if there is no -- the
4    trustees are the only ones with the asterisks?
5  A  According to this paper (indicating).
6  Q  Were you a trustee of the Winner International
7    Pennsylvania Business Trust?
8  A  I don't think so.  I'm not sure.
9  Q  Is Winner International, Inc., a successor to
10    the entire business of Winner International,
11    LLC?
12 A  What do you mean, please?
13 Q  Is Winner International, Inc., a successor to
14    the entire business of Winner International,
15    LLC?
16 A  Yes.
17 Q  Are there at the current time any other
18    businesses or business entities which have
19    Winner as a part of their name that are
20    affiliated or related to Winner International,
21    Inc.?
22 A  No, not that I can think of.
23 Q  Is there any holding company which includes

GOLDEN TRIANGLE REPORTERS
One Gateway Center - Suite 653
(412) 261-4565

39

-----

1    Winner as a part of its name which is affiliated
2    or associated with Winner International, Inc.?
3  A  They are no longer affiliated.
4  Q  Is there a Winner International holding company?
5  A  There is a Winner Holding Company.
6  Q  Do you have any title or position with the
7    Winner Holding Company?
8  A  I'm not sure if that title has ceased or not.  I
9    don't have a role there, but I don't know if
10    formally the title was ever relieved.
11 Q  What is the Winner Holding Company?
12 A  It was a group put together in the mid '90s, I
13    think it was '96, that would oversee selective
14    various Winner companies and that would allow
15    those companies to share in administrative
16    services.
17 Q  In 1996, did you have any role or responsibility
18    in connection with Winner Holding Company?
19 A  I was always involved in Winner Holding, but I'm
20    not sure what exactly my role was in 1996.
21 Q  Did your role in Winner Holding ever change?
22 A  Yes.
23 Q  How did it change?

GOLDEN TRIANGLE REPORTERS
One Gateway Center - Suite 653
(412) 261-4565

40

-----

1  A  During the course of restructuring in 2000, I
2    was no longer a part of Winner Holdings.
3  Q  From 1996 through 2000 with the restructuring,
4    what companies did Winner Holding Company
5    oversee?
6  A  Guardian, Security World, Winner International.
7    I'm not certain if there was an aviation company
8    in there at the time or not.
9  Q  That would have been Winner International, LLC?
10 A  In '96?
11 Q  Yes.
12 A  I think in '96 it is still a business trust.
13 Q  At the time of the reorganization, what was it?
14 A  In 2000?
15 Q  Yes.
16 A  It would have been the LLC.
17 Q  Who at Winner Holdings was responsible for
18    overseeing the Winner International Business
19    Trust and later the Winner International, LLC?
20 A  I'm sorry?
21 Q  Who at Winner Holdings Company was responsible
22    for oversight over the Winner International
23    company?

GOLDEN TRIANGLE REPORTERS
One Gateway Center - Suite 653
(412) 261-4565

Lawman vs Winner                                    Karen Winner Hale - 10/22/03

---

41

-----

1   A   Everyone in Holdings was responsible for
2       oversight.
3   Q   Who was the person in charge at Winner Holdings?
4   A   My father.
5   Q   That is Jim Winner?
6   A   Yes.
7   Q   Who else was responsible for operating Winner
8       Holdings in 1996?
9   A   If I refer to this (indicating), I can tell you
10      who was there.
11          My brother, James B. Winner, was a part of
12      Winner Holdings.  There was a CFO, Jeff
13      McCandless, who was active in Winner Holdings.
14      Mr. Hornbostel, our counsel, was active in
15      Winner Holdings.  I believe Albert Dombrowski
16      was active in Winner Holdings at the time.
17  Q   What role did James B. Winner play in Winner
18      Holdings?
19  A   Management overview of the various companies.
20  Q   What role did Mr. McCandless play?
21  A   Any financial oversight.
22  Q   I assume Mr. Hornbostel had legal oversight?
23  A   Correct.

GOLDEN TRIANGLE REPORTERS
One Gateway Center - Suite 653
(412) 261-4565

---

42

-----

1   Q   What was Mr. Dombrowski's role?
2   A   He worked a lot on development within the
3       companies.
4   Q   What sort of development?
5   A   For example, new stores and Security World,
6       opening new stores.
7   Q   What is Security World?
8   A   It was a chain of security stores, retail
9       stores.
10  Q   It no longer exists?
11  A   It does not.
12  Q   Did Security World exist to sell Winner product?
13  A   It sold many products as a retail store.
14  Q   Did Security World sell all of Winner products?
15  A   All of Winner products?
16  Q   At the time, yes.
17  A   No, not at the time.
18  Q   What products did Security World not sell?
19  A   I don't think they carried our brand of pepper
20      spray.  I think they had their own.  They were
21      allowed to choose which steering wheel locks,
22      which models, what colors they would carry.
23      Specifically, I can't answer that, but that is

GOLDEN TRIANGLE REPORTERS
One Gateway Center - Suite 653
(412) 261-4565

---

43

-----

1       generally the answer.
2   Q   What is Guardian?
3   A   Guardian was a pepper spray manufacturer.
4   Q   I take it it no longer exists?
5   A   It does not.  I shouldn't say that.  It was sold
6       so, no, it does not.
7   Q   Did the business of Winner Holdings change
8       between 1996 and 2000?
9   A   There were always changes.  Specifically what, I
10      can't say today.
11  Q   Were there changes in the persons who were
12      responsible for running Winner Holdings between
13      1996 and 2000?
14  A   I know that we had changes in personnel with
15      specifically our finance officer, our CFOs.
16  Q   Did you continue to function within Winner
17      Holdings between 1996 and 2000?
18  A   Yes.
19  Q   Did your responsibility change between 1996
20      and 2000 in connection with the business of
21      Winner Holdings?
22  A   No.
23  Q   As a participant in Winner Holdings, what role

GOLDEN TRIANGLE REPORTERS
One Gateway Center - Suite 653
(412) 261-4565

---

44

-----

1       or responsibility did you have with respect to
2       Winner International?
3   A   The oversight of the administration and
4       operations.
5   Q   Now, you said there was a restructuring in 2000?
6   A   Yes.
7   Q   What happened with respect to Winner Holdings
8       in 2000?
9   A   I was no longer a part of Winner Holdings and
10      the ownership in Winner Holdings changed.
11  Q   How did the ownership change?
12  A   With my -- two of my siblings.  I'm not sure
13      exactly what the percents are, but two of my
14      siblings receiving a larger percent of the
15      company and myself out completely, and my other
16      sibling, a smaller percent.
17  Q   Does Winner Holdings continue to engage in
18      oversight over Winner International?
19  A   It does not.
20  Q   Did that change in 2000 as a result of the
21      restructuring?
22  A   It did.
23  Q   Do you know what the current role of Winner

GOLDEN TRIANGLE REPORTERS
One Gateway Center - Suite 653
(412) 261-4565

45

-----

```
1      Holdings is?
2   A  I believe the only thing left in Winner Holdings
3      are some -- is a note payable, I believe.
4   Q  Payable to whom?
5   A  Winner Holdings.
6              MR. MOY:  Counsel, we have been
7              going for a little over an hour.  Is
8              it time to take a break here?
9              MS. MEADWAY:  Sure.  No problem.
10             (Brief Recess)
11  BY MS. MEADWAY:
12  Q  Is there any entity that currently performs the
13     function that Winner Holdings used to play
14     before the reorganization?
15  A  No.
16  Q  What are the current product lines of Winner
17     International?
18  A  We have automotive steering wheel locks.  We
19     have some pedal-to-wheel locks, we have many
20     SKUs of hardware.  We have pepper spray and we
21     have some odds-and-end products, just
22     miscellaneous, smaller SKUs.
23  Q  What percentage of the business of Winner
```

GOLDEN TRIANGLE REPORTERS
One Gateway Center - Suite 653
(412) 261-4565

46

-----

```
1      International in terms of dollar volume is
2      represented by the steering wheel locks for
3      automotive?
4   A  What percent of dollar volume?
5   Q  Yes.
6   A  Over 90.  Approximately 90.
7   Q  Has that changed in any way over the last four
8      years?
9   A  There was a time when hardware played a more
10     significant role, but I believe, and without any
11     numbers in front of me, I believe that the
12     dollars have shifted higher to automobiles.
13  Q  What percentage of the business of Winner
14     International is represented by the pepper
15     spray?
16  A  Single digits.
17  Q  The pedal-to-wheel locks?
18  A  We have one that I know is a top seller in
19     units.  I don't know how that converts to
20     dollars.
21  Q  What product is that?
22  A  It is one of the pedal-to-wheel locks that
23     reaches around the brake pedal and goes around
```

GOLDEN TRIANGLE REPORTERS
One Gateway Center - Suite 653
(412) 261-4565

47

-----

```
1      the steering wheel.
2   Q  Does that have a trademark?
3   A  No, I don't believe so.
4   Q  Are the odd and ends that you identified
5      automotive security products?
6   A  No.
7   Q  Other than the steering wheel locks and the
8      pedal-to-wheel locks, does Winner International
9      sell any automotive security products?
10  A  Not actively.
11  Q  Do you mean that there is inventory of other
12     products that is not actively being marketed?
13  A  Correct.
14  Q  What products are those?
15  A  We have some alarm products that we still have a
16     small inventory of.
17  Q  How many different types of steering wheel locks
18     does Winner International sell?
19  A  We now have 13.
20  Q  Can you identify those types for me?
21  A  I will try to list them.  There is a
22     Pedal-to-wheel Lock, there is a Double Hook
23     piece.  There is the item we call the SE.  There
```

GOLDEN TRIANGLE REPORTERS
One Gateway Center - Suite 653
(412) 261-4565

48

-----

```
1      is an Auto Club.  That will also be available, I
2      believe, in blue.  There is an LX product which
3      will be red, blue, clear.  There is an LX SUV,
4      which is for trucks.  There is a product
5      available for police, and there is a piece
6      called the De-Vice.  I don't know how many that
7      adds up to.
8   Q  You mentioned the De-Vice.  Let me show you what
9      has been produced by Winner in this action
10     bearing Production No. W000007 and ask if this
11     is a representative De-Vice.
12  A  Yes.
13             MS. MEADWAY:  Let's go off the
14             record.
15             (Discussion held off the record)
16  BY MS. MEADWAY:
17  Q  Ms. Hale, in connection with the De-Vice
18     Steering Wheel Lock bearing Production No. W7,
19     how long has Winner International sold that
20     product?
21  A  I believe it was introduced in 2001.
22  Q  Where is that product available for sale?
23  A  Only at Canadian Tire.
```

GOLDEN TRIANGLE REPORTERS
One Gateway Center - Suite 653
(412) 261-4565

**Lawman vs Winner**                    **Karen Winner Hale - 10/22/03**

---

53

-----

1  Q  Is the Twin Hooks products sold to Auto Zone?
2  A  No.
3  Q  Where is the Twin Hooks product sold?
4  A  In various accounts.
5  Q  Can you identify for me the five most
6     significant accounts for the Twin Hooks product?
7  A  I know it was sold to K-mart, Strauss, Pep, CSK,
8     I believe.
9  Q  Any others?
10 A  There are more, but that comes to mind right
11    away.
12 Q  What is CSK?
13 A  It is an automotive chain.
14 Q  Is the Twin Hooks or Double Hooks product sold
15    by Winner under any other trademark?
16 A  No.
17 Q  When was the Twin Hook product first sold by
18    Winner?
19 A  Twin Hook, sometime in 2001, I believe.
20 Q  When was the Double Hook product first sold by
21    Winner?
22 A  I think it was introduced in 1998.
23 Q  Was the Double Hook product the first introduced

GOLDEN TRIANGLE REPORTERS
One Gateway Center - Suite 653
(412) 261-4565

---

55

-----

1     called a Dr. Hook.
2  Q  During what period of time was the Dr. Hook
3     product sold?
4  A  It was I believe introduced in 2001.  I think it
5     was 2001.
6  Q  When was the Dr. Hook product last sold?
7  A  It has been a long time.  I'm not sure when.
8  Q  How did the Dr. Hook products differ from the
9     Double Hook product?
10 A  I'm not sure.  I think it may have been yellow.
11 Q  Any other differences?
12 A  Not that I know of, no.
13 Q  What account took the Dr. Hook product?
14 A  I don't know.
15 Q  In the period from 2000, are there any other
16    steering wheel locks that have been discontinued
17    by Winner International?
18 A  Since 2000?
19 Q  From 2000 forward.
20 A  Yes.
21 Q  What other steering wheel locks has Winner
22    discontinued selling?
23 A  Many of the Click-It Clubs, the regular Truck

GOLDEN TRIANGLE REPORTERS
One Gateway Center - Suite 653
(412) 261-4565

---

54

-----

1     by Winner with the two hooks?
2  A  Correct.
3  Q  There is one other product that we might as well
4     identify at the same time.  There is a Quad Lock
5     System Club bearing Winner Production No. W5.
6     Are you familiar with this product?
7  A  Yes.
8  Q  Is the Quad Lock System product of W5 still
9     being sold by Winner?
10 A  It is not.
11 Q  When was the Quad Lock product last sold by
12    Winner?
13 A  I'm not sure.
14 Q  When was it first sold by Winner?
15 A  During 2001, I believe.
16 Q  To whom was the Quad Lock product sold?
17 A  The only customer I'm certain that it went to
18    was Pep Boys.  I know there were more.
19 Q  Are there any other steering wheel locks that
20    Winner has sold besides the ones on the table
21    with the two-hook configuration?
22 A  There was one I believe called the De-Vice with
23    the LED.  And at one time there was something

GOLDEN TRIANGLE REPORTERS
One Gateway Center - Suite 653
(412) 261-4565

---

56

-----

1     Club, various colors of certain models.
2  Q  Has the business of Winner International been
3     downsized since 2000?
4  A  Yes.
5  Q  By what order of magnitude?
6  A  Do you mean sales or people?
7  Q  Let's do both.  Let's start with sales.
8  A  Our sales have steadily decreased.  I can't give
9     you an exact number, but they have steadily
10    decreased.
11 Q  Since what time?
12 A  I would say sometime in the '90s.
13 Q  Late '90s, early '90s?
14 A  In the second half of the '90s, they started to
15    decrease.
16 Q  Has that been consistent across all of the
17    product lines?
18 A  Yes.
19 Q  And what has been the impact on the size of the
20    company in terms of number of employees?
21 A  We are just a little more than half of what it
22    used to be.
23 Q  Who are the primary competitors of Winner

GOLDEN TRIANGLE REPORTERS
One Gateway Center - Suite 653
(412) 261-4565

93

-----

1    Steven Gafigan.
2  Q  Anything else?
3  A  I can't think of anyone else.
4  Q  Have you ever seen the Keen two-hook product?
5  A  Which product?
6  Q  The product with two hooks, the Elephant Lock.
7  A  Years ago.
8  Q  How many years ago?
9  A  I wouldn't even want to guess.  It has been many
10    years since I have seen them.
11  Q  Where did you see the Keen Elephant Lock
12    product?
13  A  I think there was a sample of it in our
14    attorney's office.
15  Q  Did you ever see the Elephant Lock product in
16    the marketplace?
17  A  Not personally.
18  Q  Do you know how long Keen was selling the
19    Elephant Lock product?
20  A  I do not.
21  Q  Do you know where Keen was selling the Elephant
22    Lock product?
23  A  I don't know that.

GOLDEN TRIANGLE REPORTERS
One Gateway Center - Suite 653
(412) 261-4565

94

-----

1  Q  Who at Winner was most knowledgeable at the time
2    concerning the Keen Elephant Lock product?
3        MR. MOY:  At which time, Counsel?
4        MS. MEADWAY:  At the time that
5    Ms. Hale saw the product.
6  BY MS. MEADWAY:
7  A  Who was the most knowledge about what, please?
8  Q  About the Elephant Lock product.
9  A  I would say the person most knowledgeable would
10    have been our attorney.
11  Q  Who connected with Winner as opposed to its
12    counsel, or are you saying John Hornbostel?
13  A  I am.
14  Q  On the business side, who at Winner was most
15    familiar with the Elephant Lock product at the
16    time you first saw it?
17  A  I don't know that.
18  Q  Do you take any steps to monitor competition at
19    Winner International?
20  A  Yes.
21  Q  What steps do you take?
22  A  Just asking the salesmen when they are working
23    with accounts what else is in the marketplace,

GOLDEN TRIANGLE REPORTERS
One Gateway Center - Suite 653
(412) 261-4565

95

-----

1    what else they see out there.
2  Q  Anything else?
3  A  Not me personally.
4  Q  Does Winner take steps to secure competitive
5    product?
6  A  I can't answer that.
7  Q  Have you ever seen competitive product at Winner
8    International?
9  A  Yes.
10  Q  In what context?
11  A  In our attorney's office when we bring them in
12    to review them.
13  Q  Does Winner International test competitors'
14    products?
15  A  Yes.
16  Q  In what circumstances?
17  A  I have seen them being tested on wheels or brake
18    locks to see how easy or hard they are to use.
19  Q  Anything besides simply putting it on the car?
20  A  I know that there are other tests done, but I
21    haven't done them myself.
22  Q  What other tests are done?
23  A  I know that in the past they have done things

GOLDEN TRIANGLE REPORTERS
One Gateway Center - Suite 653
(412) 261-4565

96

-----

1    like try to bend hooks or try to defeat the
2    lock, just practical tests.
3  Q  Are records maintained of testing?
4  A  I don't know that.
5  Q  Have you ever seen records of testing?
6  A  Not that I remember.
7  Q  Were you familiar with the Keen Elephant Lock at
8    the time Winner began working on the Double
9    Hook?
10  A  I'm not sure of the dates.
11  Q  Was the Winner Double Hook product a response to
12    the Keen Elephant Lock product?
13  A  I can't answer that.
14  Q  Were you familiar with other double-hook
15    products at the time Winner introduced the
16    Double Hook product?
17  A  I know they existed.
18  Q  What double-hook products do you know existed at
19    the time that Winner introduced the Double Hook
20    product?
21  A  I don't know what they were called.  I just know
22    there were some already in existence.
23  Q  Do you know who made them?

GOLDEN TRIANGLE REPORTERS
One Gateway Center - Suite 653
(412) 261-4565

Lawman vs Winner                           Karen Winner Hale - 10/22/03

97

            -----
1   A   No.
2   Q   Do you know where they were offered for sale?
3   A   I know Auto Zone was one of them.
4   Q   Do you know whose products Auto Zone was
5       selling?
6   A   I'm not sure.
7   Q   Where is Auto Zone located?
8   A   Their main offices are in Tennessee.
9   Q   Is Auto Zone a customer of Winner International?
10  A   Yes.
11  Q   For what products?
12  A   I'm not sure what all they carry now.
13  Q   Has the cost to Winner of the Double Hook
14      product changed since the product was
15      introduced?
16  A   Without records, I can't answer that.
17  Q   Has the price charged by Winner to its customers
18      for the Double Hook products changed since the
19      product was introduced?
20  A   Without records, I can't answer that.
21  Q   Does Winner have a schedule of regular price
22      increases?
23  A   No, we don't.
                GOLDEN TRIANGLE REPORTERS
                One Gateway Center - Suite 653
                     (412) 261-4565

98

            -----
1   Q   When was the last time Winner had a price
2       increase to its customers on steering wheel
3       locks?
4   A   I'm not sure Winner ever did a price increase to
5       its customers.
6   Q   Does Winner International currently have an
7       advertising or promotional budget for the Double
8       Hook product?
9   A   No, we don't.
10  Q   Does Winner currently take any steps to
11      advertise or promote the Double Hook product?
12  A   As far as I know, I don't know anything
13      specific.
14  Q   Did Winner ever advertise the Double Hook
15      product?
16  A   I don't remember us ever advertising it.
17  Q   Has the Winner Double Hook product ever been the
18      subject of an infomercial?
19  A   Not that I know of.
20  Q   Has the Winner Double Hook product ever been
21      marketed direct to the public in any other way?
22  A   No, not that I recall.
23  Q   Does Winner International have a standard cost
                GOLDEN TRIANGLE REPORTERS
                One Gateway Center - Suite 653
                     (412) 261-4565

99

            -----
1       of sales for steering wheel lock products?
2   A   Could you explain that?
3   Q   Is there a cost of sales that Winner routinely
4       figures into its budget?
5   A   I'm not sure what you are looking for.
6   Q   Are there certain expenses that are attributed
7       to the sales of particular products?
8   A   No.
9   Q   Is there any portion of the sales force that is
10      devoted exclusively to selling the Double Hook
11      product?
12  A   No.
13  Q   Are you familiar with Paul Yang?
14  A   Only the name.
15  Q   Have you ever corresponded with Mr. Yang?
16  A   Personally?
17  Q   Yes.
18  A   Not that I recall.
19  Q   I am going to show you a copy of Yang Design
20      Patent 357621.
21          Ms. Hale, have you seen Design Patent 35761
22      before?
23  A   Yes.
                GOLDEN TRIANGLE REPORTERS
                One Gateway Center - Suite 653
                     (412) 261-4565

100

            -----
1   Q   When did you first see that patent?
2   A   I'm not sure exactly the first time.
3   Q   Approximately when?
4   A   Beginning of 1998.
5   Q   In what context did you first see Design
6       Patent 357621?
7   A   When we had asked for an opinion from our patent
8       counsel about this design and the product that
9       our sales force wanted to bring out.
10  Q   What counsel did you discuss Design Patent
11      357621 with?
12  A   His name?
13  Q   Yes.
14  A   Bob Vickers.
15  Q   Did Mr. Vickers bring the patent to you or did
16      you bring it to Mr. Vickers?
17  A   I really can't remember how. I can't remember
18      how we came about asking him for the opinion.
19  Q   Did you ask Mr. Vickers for the opinion in
20      connection with a new product?
21  A   It was about the new product.
22  Q   What new product was that?
23  A   It was about the 0005.
                GOLDEN TRIANGLE REPORTERS
                One Gateway Center - Suite 653
                     (412) 261-4565

## CERTIFICATE OF SERVICE

I, Corey Field, Esquire, hereby certify that a true and correct copy of the foregoing Reply Brief to Defendant's Opposition to Lawman's Motion to Amend and accompanying exhibits was served this date, by the manner indicated, on all counsel of record addressed as follows:

VIA FACSIMILE AND HAND DELIVERY:

Mr. Christopher A. Rothe
Dann Dorfman Herrell and Skillman, P.C.
Suite 720, 1601 Market Street
Philadelphia, PA 19103-2307

BY FIRST CLASS MAIL:

Philip J. Moy, Jr.
Robert V. Vickers
Jude A. Fry
Fay, Sharpe, Fagan, Minnich & McKee, LLP
1100 Superior Avenue – Seventh Floor
Cleveland, Ohio  44114-2579

Corey Field
BALLARD SPAHR ANDREWS & INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 864-8130

Date: November 3, 2003